IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case Number: 7:20-CV-85-BR

| | | |
|---|---|---|
| JEANNIE MAE BARDEN, | ) | |
| MONTRINA BONEY, | ) | |
| JANICE CHASTEN, | ) | |
| BETTY FRAZELLE, | ) | |
| THELMA GLASPER, | ) | **JURY TRIAL DEMANDED** |
| CHRISTINE HIGHSMITH, | ) | |
| ALFREDA GLASPER HUMPHREY, | ) | |
| BEVERLY TOMEKIA JONES, | ) | |
| GREGORY MCCOY, JR., | ) | **JUDGE: EARL BRITT** |
| ANDRENA MCCULLEN, | ) | |
| NANCY NEWTON, | ) | |
| ANNETTE PEARSALL, | ) | |
| KATHY PEARSALL, | ) | |
| LEONARD PEARSALL, | ) | |
| LOUISE JONES PEARSALL, | ) | |
| NORWOOD EARL PEARSALL, | ) | |
| WILLIAM PEARSALL, | ) | |
| HERNDON WILLIAMS, | ) | |
| MARGARET WILLIAMS, | ) | |
| MAVIS WOMBLE, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MURPHY-BROWN, LLC, | ) | |
| **SERVICE**: | ) | |
| REGISTERED AGENT: | ) | |
| BRADY STEWART | ) | |
| 2822 HIGHWAY 24 WEST | ) | |
| WARSAW, NC 28398 | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| SMITHFIELD FOODS, INC., | ) | |
| **SERVICE**: | ) | |
| REGISTERED AGENT: | | |
| C T CORP. SYSTEM | | |
| 150 FAYETTEVILLE ST. #1011 | | |
| RALEIGH, NC 27601 | | |
| | | |
| DEFENDANTS. | | |

## AMENDED COMPLAINT

PLAINTIFFS, by and through the undersigned counsel, bring this Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1) seeking judgment against Murphy-Brown, LLC ("Murphy-Brown") and Smithfield Foods, Inc. ("Smithfield") (Collectively referred to as "Defendants"). Plaintiffs allege the following:

## I.   INTRODUCTION

1.      The Plaintiffs are residents of Duplin County, North Carolina.

2.      During the pertinent times, the Defendants have owned, controlled, raised and/or managed swine in close proximity to Plaintiffs' homes or other property.  The swine operation pertinent to this case is considered a Large Concentrated Animal Feeding Operation[1] ("CAFO") because of the size of the facilities. This CAFO is identified by permit number AWI310082.  The CAFO, d/b/a Vestal Farm #1 and #2 (hereinafter "Vestal" or "Vestal Farms") has an address of 899-A NC Hwy 50 South, Magnolia, NC 28453.

3.      Upon information and belief, during some or all of the last three years, Smithfield entered into contracts with Murphy-Brown, LLC d/b/a Vestal Farms for the concentrated raising of swine.

4.      Vestal houses over twenty thousand (20,000) "feeder to finish" swine owned, during the pertinent times, by the Defendant, Murphy-Brown.  Feeder to Finish hog operations such as Vestal, purchase swine at a young age and fatten them up before slaughtering.

5.      Defendant Murphy-Brown's hogs at these facilities generate many times more sewage than the entire nearby towns of Kenansville and Magnolia combined. Despite the enormity,

---

[1] CAFO is defined as having 2500 swine weighing more than 55lbs, for more than 45 days during the year. https://www3.epa.gov/npdes/pubs/cafo_brochure_swine.pdf

Murphy-Brown has failed to take adequate steps to control the millions of gallons of feces and urine that come from the hogs. The Defendants have failed to control the odor, urine, feces, manure, flies and other vectors which Defendants allow to trespass onto Plaintiffs' properties.

6.     Defendant Murphy-Brown is a large enterprise with the ability and the resources to reduce and end the trespass onto Plaintiffs' properties. Murphy-Brown owns more than 5 million hogs at more than 1400 sites in North Carolina and hogs and facilities in 11 other States including: Colorado, Illinois, Iowa, Missouri, South Carolina, Oklahoma, Pennsylvania, South Dakota, Texas, Utah and Virginia. Murphy-Brown owns the hogs at Vestal and closely controls how they are managed.

7.     Defendant Murphy-Brown's parent company Defendant Smithfield Foods, Inc. was sold to a Chinese-backed multinational corporation, Shuanghui, in late 2013 in a transaction estimated to have a value in excess of $7 billion. Shuanghui subsequently changed its name to WH Group, Limited. Defendants clearly have the resources to eliminate the factors, which result in a trespass onto Plaintiffs' properties.

8.     Defendant Murphy-Brown still uses the outmoded "lagoon and sprayfield" system at Vestal. This system has been banned for new farms in North Carolina for more than a decade because of the environmental consequences. These systems spray nearby fields with liquified manure fouling the rural landscape and causing noxious smells. These sprayfields are not adequately monitored or controlled causing the liquid manure to drift in the wind and trespass on Plaintiffs' properties.

9.     Defendants have the knowledge, means and ability to correct the trespass onto Plaintiffs' properties but have failed to do so purposefully, knowingly, negligently and improperly.

10.     In addition, and as an independent cause of the trespass, the presence of urine and feces on Plaintiffs' property, has caused periodic swarms of flies, insects, and other pests. Large black flies periodically descend upon Plaintiffs' properties, ruining and interfering with family activities, cookouts and other outdoor events. Other insects such as gnats come onto Plaintiffs' land. The gnats and flies get stuck to windows and get inside the homes. Other vermin such as buzzards have come onto the properties. These insects and pests are "vectors" for disease.

11.     Often Plaintiffs must clean manure off their cars and house windows because of the liquid manure spray that drifts in the wind.  This manure is a direct result of Defendants failing to monitor and control operations at Vestal.

12.     Further, as another independent cause of the Defendants' trespass, Defendants Murphy-Brown' hogs necessitate very large trucks. These trucks crawl up and down the streets outside of the Plaintiffs' homes. These streets are often narrow and even unpaved country lanes, which normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out both live hogs and dead hogs. These trucks often go by Plaintiffs' homes in the dead of night causing noise, dust, liquid and dead animal parts to spill from the trucks onto Plaintiffs' properties. Moreover, bright lights shine from the Trucks' headlamps into Plaintiffs' homes. They are the opposite of what one would expect to see going by one's home in such a rural country neighborhood.

13.     Defendants' dead hogs result in a trespass onto Plaintiffs' properties. The dead hogs are from time to time placed in "dead boxes" which are nothing more than dumpsters full of dead animals' rotting carcasses, and the revolting stench of death left out in the open in plain view. These "dead boxes" are unsightly and attract buzzards, swarms of flies and vermin.  These vermin drop hog bones, rotting flesh, and other discarded swine body parts on Plaintiffs' property.

## II.    PARTIES

### A.    PLAINTIFFS

14.    Plaintiff Jeannie Mae Barden is a resident of North Carolina who resides at 1138 Paul Ed Dail Road, Kenansville, NC.

15.    Plaintiff Montrina Boney is a resident of North Carolina who resides at 989 S. NC Hwy 50, Magnolia, NC.

16.    Plaintiff Janice Chasten is a resident of North Carolina who resides at 136 E. T. Dobson Lane,  Magnolia, NC.

17.    Plaintiff Betty Frazelle is a resident of North Carolina who resides at 925 S. NC Hwy 50, Magnolia, NC.

18.    Plaintiff Thelma Glasper is a resident of North Carolina who resides at 588 S. NC Hwy 50, Kenansville, NC.

19.    Plaintiff Christine Highsmith is a resident of North Carolina who resides at 929 S. NC Hwy 50, Magnolia, NC.

20.    Plaintiff Alfreda Glasper Humphrey is a resident of North Carolina who resides at 659 S. NC Hwy 50, Kenansville, NC.

21.    Plaintiff Beverly Tomekia Jones is a resident of North Carolina who resides at 925 S. NC Hwy 50, Magnolia, NC.

22.    Plaintiff Gregory McCoy, Jr. is a resident of North Carolina who resides at 659 S. NC Hwy 50, Kenansville, NC.

23.    Plaintiff Adrena McCullen is a resident of North Carolina who resides at 989 S. NC Hwy 50, Magnolia, NC.

24.     Plaintiff Nancy Newton is a resident of North Carolina who resides at 929 S. NC Hwy 50, Magnolia, NC.

25.     Plaintiff Annette Pearsall is a resident of North Carolina who resides at 1148 Paul Ed Dail Rd, Kenansville, NC.

26.     Plaintiff Kathy Pearsall is a resident of North Carolina who resides at 1158 Paul Ed Dail Rd, Kenansville, NC.

27.     Plaintiff Leonard Pearsall is a resident of North Carolina who resides at 1138 Paul Ed Dail Rd, Kenansville, NC.

28.     Plaintiff Louise Jones Pearsall is a resident of North Carolina who resides at 1158 Paul Ed Dail Rd, Kenansville, NC.

29.     Plaintiff Norwood Earl Pearsall is a resident of North Carolina who resides at 1154 Paul Ed Dail Rd, Kenansville, NC.

30.     Plaintiff William Pearsall is a resident of North Carolina who resides at 1148 Paul Ed Dail Rd, Kenansville, NC.

31.     Plaintiffs Herndon and Margaret Williams are residents of North Carolina who reside at 248 E. T. Dobson Lane, Magnolia, NC.

32.     Plaintiff Mavis Womble is a resident of North Carolina who resides at 238 E. T. Dobson Ln, Magnolia, NC.

**B.     DEFENDANTS**

33.     Defendant Murphy-Brown, LLC is a limited liability company organized under the laws of the State of Delaware. Murphy-Brown's sole member is Smithfield Packaged Meats Corp. f/k/a John Morrell & Co. ("Smithfield Packaged Meats"), a corporation incorporated under the laws of Delaware and with its principal office located at 200 Commerce Street, Smithfield, VA

23430. Smithfield Packaged Meats is a division of Defendant Smithfield. During the pertinent times, Murphy-Brown has conducted business in many states, including North Carolina.

34.     Defendant Smithfield, is a business corporation incorporated under the laws of the State of Virginia, with its principal office located at 200 Commerce Street, Smithfield VA 23430. Defendant Smithfield is a wholly owned subsidiary of WH Group. During the pertinent times, Smithfield has conducted business in many states, including North Carolina. Smithfield is the largest hog and pork producer in the world.

## III.     <u>JURISDICTION AND VENUE</u>

35.     The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

36.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

## IV.     <u>FACTUAL BACKGROUND</u>

### A.     PLAINTIFF BACKGROUND

38.     During the pertinent times, the Plaintiffs have suffered injury and harm as a direct result of the tens of thousands of swine placed near their homes by Defendants. Defendants' hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floors into holding ponds below the floors that hold those raw feces and urine. Stench rises from below the floors and throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and

stench from below-floor manure is blown out by large fans set in hog shed walls or by other means with the stench and the dust, skin cells, particulates, dried fecal matter being blown and trespassing onto Plaintiffs' properties.

39.     The urine and feces go into giant holding ponds outdoors from which it evaporates and may leak and spill. Because Defendants do not cover the cesspools, or demand that they be covered, the cesspools are free to evaporate odor into the air and consequently attract flies. The slurry or liquid containing the urine and feces is also sprayed into the air and onto fields around the hog sheds causing odorous fecal and urine-laden mist to drift through the air, go onto neighboring lands, including trespassing onto Plaintiffs' properties, and moisture and matter to fall and puddle on the soil so that more odor rises off it. Sites must spray large quantities or else the "lagoons" will overflow. Defendants refuse to truck manure away by tanker truck although they have the capacity to do so. In addition, Defendants have the technical knowledge to treat and neutralize the hog urine and manure but refuse to do so.  One or more Plaintiffs have witnessed spraying and the spray mist of fecal matter trespassing onto their properties, coating their homes yards and vehicles in a film of hog manure. The spraying occurs on a regular basis and causes a sickening stench. Dead hogs are placed in "dead boxes" where they rot and decompose until picked up by "dead trucks." Large hog trucks carry hogs into and out of the facilities. All of these activities cause odor, annoyance, fecal mist, dust, and noise. The stench and associated odor, annoyance, dust, and noise are further trespasses onto Plaintiffs' properties, which also embarrass and humiliate the Plaintiffs. Along with the embarrassment and humiliation suffered by the Plaintiffs as a result of Defendants' trespasses, they have lost the use and enjoyment of their homesteads.

40.     Plaintiffs have suffered episodes of the trespass of noxious and sickening odor, which results in nausea, burning and watery eyes; the trespass of drifting of odorous mist and spray

onto their land; the trespass of onslaughts of flies and pests that feast on the manure, fecal mist, and urine; all of which causes stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities such as cookouts, gardening, lawn chores; the inability of Plaintiffs to keep their windows and doors open because of the trespassing odor and flies; and the Plaintiffs' difficulty with breathing and numerous other harms.

41.     Plaintiffs have employed measures and incurred expenses to try to protect themselves and prevent their exposures from the noxious debris the hog sites and large hog trucks that pass up and down their rural roads. They variously engage in keeping windows and doors closed and running air conditioners during mild weather, caulking and employing other sealants on windows and doors, purchasing cans of spray insecticides, paying to have their yards sprayed with pesticides, purchasing flypaper strips, purchasing bottled water so as to avoid using well water, purchasing scented candles or incense, and purchasing air fresheners, purifiers, and deodorizers.

42.     Plaintiffs have suffered decline in property values; horrible smells of hog feces, urine, body odor, and corpses; the sight of dead, bloated, and decaying hogs; liquids including hog urine and feces along with rotting body parts dripping from passing hog trucks and "dead trucks"; the increased pest populations; and other aspects of the Defendants' trespasses. The Plaintiffs feel angry, fearful, worried, and depressed. They are worried and fearful about their health, children's health, and their grandchildren's health. They are angry and depressed because Murphy-Brown has purposefully done nothing to fix these problems. Below are just a sampling of some of the injuries suffered by these Plaintiffs and additional facts regarding their families.

> **i.      Jeannie Mae Barden.**

43.     Jeannie Mae Barden has lived on the property at 1138 Paul Ed Dail Rd for eleven years.  The property is owned by Kathy Pearsall, but Leonard Pearsall has agreed to help pay the taxes on the property.

44.     She used to be able to grill out and sit outside.

45.     Now, the trespassing dust that carries the hog odor, blown onto her property from Defendants' hog farms, especially when Defendants land apply hog manure to their fields, makes conditions outside her house so bad that she cannot grill out or sit outside.

46.     The fecal dust gets onto her car and it is hard to get it off.

47.     They used to grill out about once or twice or three times a week.

48.     They have not grilled out at all this year.

49.     In addition to the dust carrying the hog odor, it attracts flies to her yard and house.

50.     The flies from Defendants' hog farms will be everywhere because of the dust from the Defendants' hog farms that has trespassed onto her property.

51.     She cannot open her door for the flies.

52.     She has big flies, especially in her yard.

53.     Her family does not sit outside like they used to because of the odor and flies.

54.     Sometimes the odor carried by the dust from the hog farms smells worse when it rains. The rain does not wash the smell away. It might make the flies hide but they do not go far.

55.     The flies have gotten worse over the years – there are more flies and more odor.

56.     If they try to grill out, they must fan the flies away from their food.

57.     They cannot eat under the trees, because of the flies.

58.     Fly spray does not do any good.  "The flies are all around."

59.     The flies gather on the doors.

60.     They used to plant greens in the garden - collard greens and such. But they, Leonard Pearsall's family have not done that for a couple of years.

61.     They liked to go for walks from time to time.

62.     Now because of the odor carried by the trespassing dust Leonard's nephew doesn't like to take walks because of the smell.

63.     Her eleven-year-old granddaughter will not go outside. She is not going to stay outside long. She complains about the flies and the smell.

64.     Most of the time her granddaughter will stay in the house. Sometimes she'll come out if she can ride her bike. She can ride it once or twice a week. The smell is better when it's cold, but even when it is cold you still can smell it.

65.     Some days are worse, some days it may not be as bad.

66.     Sometimes she can smell the hog odor, carried by the dust, coming in the house.

67.     The dust carrying the odor will come in the windows.

68.     The flies, attracted to the odor carried by the trespassing dust come in whenever she opens a door.

69.     She keeps Hot Shot fly spray handy. She sprays it on her legs to keep the flies off.

        ii.     **Montrina Boney**.

70.     Montrina Boney, has lived on the property at 989 S. NC Hwy 50, which she owns, for 45 years.

71.     She has limited outdoor family functions. They have decreased in number due to the order and the increase in the number of flies.

72.     The odor is carried on the hog manure laden dust, which trespasses onto her property from Defendants' hog farms.

73.     They used to have something just about every other weekend or more.  They are really family oriented.  They would have anywhere from 30 to 100 people at a family function.

74.     They would cook out, play volleyball, sit out and play card games. They had outside activities with the children…a small pool. There would be walking, exercising and dancing, just family fun.

75.     They still have one, every now and then, it depends on how the weather is because that has a lot to do with the severity of the trespassing odor.

76.     Now they have the gathering indoors with a lot fewer people.

77.     The kids are disappointed.  It used to be lots of fun seeing all of the cousins, all playing outside and the adults sitting outside watching the kids.

78.     The flies, which are attracted to the hog manure dust, are worse after the rain.  They are also bad on warm days.

79.     She tries not to be out that much, because when she is outside she has to fan the flies away.

80.     There are so many flies that she could not begin to count them.

81.     The odor is like riding behind an oil truck – it's usually strong, and when the wind blows, the odor really gets bad.

82.     If she is riding in her car when Defendants are spraying hog manure it will blow onto her vehicle.  The manure is hard to remove from her car.

83.     The hog manure dust will also blow onto her car when it is in her driveway.

84.     Foul smelling liquid will flow out of Defendants' hog trucks and will trespass into her driveway.

85.     Flies are attracted to that liquid.

### iii. **Janice Chasten**.

86.    Janice Chasten has lived on the property at 136 E. T. Dobson Lane, which she owns, for twenty-five years.

87.    She has been living on her property since 1995. She and her husband, since deceased, used to host parties and gatherings in their backyard but they stopped doing it when the hog farm was built because of the stinky smell that is carried on the trespassing dust that comes from the hog farm.

88.    They were not sure if the smell would contaminate the food they served so they just stopped having parties and gatherings.

89.    There is a river-like canal that goes across the street behind Beverly Jones' property. When it rains hard, that canal floods and the water turns green.

90.    She is unable to go out when that happens.

91.    She has a swing on her property and sometimes the water gets so high that you cannot see the swing anymore.

92.    The smell here is really horrible, especially when the Defendants spray something on their land. "Oooff, it is really stinky!"

93.    She just wants to enjoy the rest of her life living on her little property.

94.    She just wants to be able to do the things she used to do before the hog farm was built.

### iv. **Betty Frazelle**.

95.    Betty Frazelle has lived on the property at 925 S. NC Hwy 50 for sixty years.

96.     When it rains, the water gets so high that sometimes it causes flooding. It smells really bad and the water is green and slimy looking. The place gets muddy as well. She cannot stand going or staying outside anymore.

97.     They get foul smelling hog manure mist that trespasses onto their property, blowing onto their home, yard, and car from Defendants' land application fields.

98.     She used to enjoy sitting on the porch with her daughter and having cookouts and family gatherings, like picnics.

99.     They used to host a lot of gatherings but they cannot do it anymore because of the odor that is carried by the trespassing hog manure dust and particulate matter from Defendants' hog farms.

100.    Sometimes the smell gets so bad that she has to wear something over her nose so she will not be able to smell it.

101.    During the summer, when they turn on the air conditioner, the odor goes inside the house because the air conditioner sucks in the dust that has trespassed onto their property from the land application fields. They cannot do anything about it though as they need to use the air conditioner if it's really hot. They just have to endure the hog farm odor.

102.    The trespassing dust, which carries the odor attracts flies to their property. Flies doubled in number when the hog farm was built.

103.    She gets embarrassed because of the odor because the person delivering their mail would often complain and tell her how bad the odor is.

104.    It makes her feel embarrassed having to live near a hog farm.

105.     She has seen foul smelling liquid coming out of Defendants' hog trucks. That liquid

pools in the road. They have to drive through it, getting it all over their car.  That liquid attracts

flies.

### v.     **Thelma Glasper**.

106.     Thelma Glasper has resided at the property at 588 S. NC Hwy 50, which she owns,

for 43 years.

107.     Ms. Glasper's property is less than 1 mile from the hog farms identified as Vestal

Farm #1 & # 2.

108.     During the pertinent times and over the last several years, Ms. Glasper has inhaled

periodic foul odors carried by dust that trespassed onto her property from the Defendants' hogs

and their manure, urine, and their dead animals.  While on her property, she has frequently smelled

strong, foul odors of hogs.  These odors have been at times unbearable.

109.     When the hog odor is bad, Ms. Glasper must keep the windows closed and use air

fresheners to help mask the odors.  The property value of Ms. Glasper's home is now less because

of the presence of the hogs.

110.     Ms. Glasper has found that outdoor family gatherings are less enjoyable and almost

impossible to schedule due to the unpredictable nature of determining when foul and sickening

odors and flies will arrive attracted by the dust trespassing onto their property from Defendants'

hog farms. [2]

### vi.     **Christine Highsmith**.

111.     Christine Highsmith resides at the property at 929 S. NC Hwy 50.

---

[2] See narrative of Alfreda Humphrey ¶ vii for other impacts the hog farms have on Ms. Glasper
and her family.

112.     Living near a hog farm is hard – the foul-smelling manure laden mist from Defendants' land application fields trespasses onto her property.

113.     That mist blows onto her car, house, and property.

114.     The mist attracts flies to their property.

115.     She has been living on her property for almost 60 years, but she is not able to enjoy her neighborhood as much as she did before.

116.     She usually enjoyed having long walks around the area to get fresh air but now, she cannot do that because of the hog odors.

117.     She cannot even stay outside for more than fifteen minutes because of the stinky smell that is carried by the dust that trespasses onto her property from the hog farm.

118.     Her family enjoyed spending time outside the house, having chit chats while watching the children play around.  They are not able to do that anymore because the hog odor is really bad.

119.     They no longer have their usual family cookouts because there are a lot of flies that are attracted to the odor that is carried by the dust that trespasses onto her property from Defendants' hog farms.

120.     They cannot stand the smell as well as the flies flying and buzzing around.

121.     If she goes outside, she has to endure being followed by the flies.

122.     She cannot even open her doors or windows as the flies tend to go inside the house whenever the opportunity presents itself. It is really frustrating.

123.     The most disgusting part of all this is when the Defendants spray the hog manure onto their fields. The smell is really bad as it is carried by the mist from the land application, which drifts onto her property.

124.    She has seen foul-smelling liquid coming out of the Defendants' hog trucks.

125.    The liquid pools on the road in front of her property.

126.    When it rains, that liquid washes onto and trespasses onto her property, carrying terrible odors and attracting flies.

### vii.    **Alfreda Glasper Humphrey and Gregory McCoy, Jr**.

127.    Alfreda Glasper Humphrey has resided at the property at 659 S. NC Hwy 50, which she has owned for 37 years. Gregory McCoy, Jr. has lived there his entire life.

128.    Ms. Humphrey's property is less than 1 mile from the hog farms, Vestal Farm #1 & # 2, which Defendant Murphy-Brown owned during the pertinent period.

129.    Prior to the CAFOs, Ms. Humphrey enjoyed sitting on the front porch watching her grandchildren play and working in her flowerbeds.  Since the Defendants began running their CAFOs, Ms. Humphrey has had a diminished ability to enjoy her property due to noxious odors and foul hog smells that is carried on the dust from Defendants' hog farms and from their land application of manure that trespasses onto her property.

130.    Ms. Humphrey can no longer dry her clothes on her outside clothesline because of the sickening smells carried by the trespassing hog manure dust that seep into her clothes.

131.    Her family used to love having cookouts and just sitting on the front porch.  That is difficult to do now because the odor carried by the dust from the hog farms make a person want to vomit.

132.    Trespassing mist from Defendants' land application of manure has drifted onto her car and her house.

133.    She has to power wash her house every year to get rid of the manure dust that has trespassed onto her property.

134.     The odor and the flies are worse in the summertime – the odor is carried on the dust from the hog farms and the flies are attracted to it.  There are more flies in the summer and the odor is awful.

135.     When they go inside, they take off their coat and jackets and leave them by the door with their shoes because they carry the hog odor.

136.     Ms. Humphrey's three grandchildren now live in Wilmington, NC and often speak of how Grandma Humphrey's home stinks, which causes her embarrassment, humiliation, frustration, and sadness because her grandchildren don't want to visit her because of the stench and flies she must contend with on a daily basis.   Additionally, when other family members come from Washington D.C. and New York to visit, she constantly worries about whether the Defendants' hog farm is going to "really act-up" by smelling during their visits.

137.     She is embarrassed by the hog odor, but they cannot stop living their lives.

138.     Ms. Humphrey experiences a new odor source from the flaring activity at the Vestal Farms.

139.     Gregory McCoy, Jr. would like to help his mother more around the house, but often finds outside activities he once enjoyed increasingly arduous because of the incredible hog smell and flies that are the consequence of the trespassing dust the is carried from Defendants' hog farms onto their property.

140.     Prior to the CAFOs, Mr. McCoy, Jr. would do all the outside grilling.  Now, he becomes frustrated by having to cook in conditions that are so nauseating that he loses interest in what he is preparing.

141.    If he can persist through cooking in the foul hog smells, then Mr. McCoy, Jr. worries about the large flies, which swarm from the CAFOs – as they are attracted to the hog manure dust trespassing onto their property and contaminating their food.

### viii.    Beverly Tomekia Jones.

142.    Beverly Tomekia Jones has resided at 925 S. NC Hwy 50 her entire life.

143.    The problem with the hog farm is the smell. The smell is horrible! The odor is carried on the hog manure dust that trespasses onto her property from Defendants' hog farms.

144.    She used to enjoy sitting on the porch but now she cannot do it because of the disgusting smell that is brought by the dust and mist, which trespasses onto her property from Defendants' hog farm.  She cannot see the particulate matter, which trespasses, but, she can smell the odor, which is proof that the dust and particulate matter is there.

145.    They also have a flooding issue. There is a canal between their house and the hog farm. Before it was just a small river with little water but when the hog farm was built, the canal floods and it is smelly.

146.    Her family used to sit on their porch to enjoy the air and the surroundings. They used to do a lot of barbecue for the kids especially during holidays and birthday parties.

147.    They are not able to do sit on their porch or barbecue for the kids as they cannot stand the smell outside and they cannot stand the flies.

148.    There are a lot of flies now that are attracted to the odor carried by the trespassing dust and mist from Defendants' hog farm.

149.    She has been living here for 36 years and her mom has been here for 45 years. They are not able to enjoy their property like they used to before the hog farm came.

150.    Additionally, when the hog truck comes by, it drips foul smelling liquid onto the road, which they have to drive through, and if they have to drive behind one of the hog trucks the liquid drifts behind and trespasses onto their car.

151.    The liquid also attracts flies.

ix.    **Adrena McCullen**.

152.    Adrena McCullen has resided at 989 S. NC Hwy 50, which she owns, for 23 years.

153.    She lives less than a mile away from the hog farm.

154.    They get foul-smelling land application mist trespassing onto their property.

155.    The mist blows onto their yard, their house and their car.

156.    The odor carried by the mist attracts flies to their property.

157.    Foul-smelling liquid from the hog trucks pools onto the road by their house and trespasses onto their yard.

158.    That trespassing liquid attracts flies to their property.

159.    When she and her son come in from outside she washes him down, he washes his hands, and she changes his clothes. She does the same for herself.  The hog odor carried by the trespassing hog manure dust clings to their clothes and to their skin.

160.    They definitely go the extra mile to keep the hog manure dust carrying the hog manure odor out of the house but when they get inside that is all you smell.

x.    **Nancy Newton**.

161.    Nancy Newton has resided at 929 S. NC Hwy 50 for over twenty years.

162.    Trespassing hog manure dust is carried onto her property from Defendants' hog farms and land application fields.  That trespassing dust carries the terrible hog odor and attracts

flies to her property. They cannot go out anymore. They have to stay inside because of the disgusting hog odor carried by the trespassing dust from the hog farms.

163.     When she goes out, there are flies that would follow her buzzing around her head.

164.     She can see the hog manure mist coming from the land application fields – it trespasses onto her property, her house, and gets all over her car.

165.     She cannot stay outside for more than five minutes anymore - she just goes out to check the mail and if she needs to she will go to town for groceries.

### xi.     Annette Pearsall.

166.     Annette Pearsall resides at 1148 Paul Ed Dail Road. The property has been owned by her family for three generations and she has lived there for over twenty-five years.

167.     Hog farm dust and particulate matter trespass onto her property carrying along with them the terrible hog farm odor.

168.     Sometimes she cannot even sit on the porch because the smell is so strong.

169.     When the wind blows, it pushes the dust from the hog farm to her property, bearing the horrible stench.

170.     Liquid from the hog trucks pools on the road and when it rains it washes into her yard, trespassing onto her property.

171.     The liquid smells terrible and attracts flies to her yard.

172.     The manure dust also attracts flies to her property.

173.     Her yard can be full of flies which are attracted to the dust from Defendants' hog farms and from the hog truck liquid.

174.    Kathy Pearsall has resided at 1158 Paul Ed Dail Road, which she has owned for sixty-five years.  Her mother has lived there for eighty-five years.

175.    Dust from the hog farms and from Defendants' land application of hog manure blows and trespasses onto her property.  The dust carries the terrible hog odor. The odor is so bad she cannot even sit on the porch.

176.    The odor, carried by the dust, comes into and goes everywhere in her house. It is terrible in the summertime.

177.    Nobody can even eat, because the smell is so bad. Sometimes she will make a meal and not even be able to eat it until later due to the odor.

178.    She used to be outside all the time. She had to use a push lawn mower, but she cannot mow or rake the yard anymore because of the hog odor.

179.    If she has to do any yard work, she wears a mask just to do basic things outside or she will get a headache. There is nothing they can do about it.

180.    She cannot have any cookouts in the summertime with friends and family because no one wants to smell the hog farm odor carried by the manure dust that trespasses onto her property.

181.    Liquid from Defendants' hog trucks pools on the roads and then trespasses onto her property – washed there when it rains.

182.    That liquid really stinks.

183.    She has to drive her car through those pools of liquid.

---

[3] Ms. Pearsall suffers from Alzheimer's and is not able to speak for herself – her narrative is being supplied by her daughter, Kathy Pearsall.

184. Mrs. Pearsall loved her flowers. She loved to go into her garden and work with her flowers and things like that. She still loves her flower bed. Her daughter, Kathy, tells her, "don't go out there and worry about your flower bed. That scent is bad for everybody."

185. Mrs. Pearsall can walk and get around. Her exercise is limited. Kathy Pearsall does not let her go outside when the wind starts blowing, causing the odor-bearing dust to trespass onto their property. They both stay in the house then.

186. Mrs. Pearsall likes to sit on the porch. Kathy makes sure to keep an eye on her mother to make sure she is safe from the odor-bearing dust.

187. They can smell the odor when Defendants are spraying the manure on their fields. The land application mist blows onto their property, carrying a terrible odor. Kathy wants her mom to be in the house, because at her age she doesn't need to be out there in the odor.

188. She used to help Kathy in the garden. Now she isn't allowed to when the smell is bad because it can harm her health.

189. Kathy tries to not let the odor and the other contaminants from the hog farm get in her mom's system, because of her age.

190. When the odor is bad, Kathy turns the fan on in the house.

191. When hog trucks go back and forth by their house on their way to and from Defendants' hog farms they hurry and get in the house because of the smell that comes off of the trucks and from the pools of liquid left in the road by the trucks.

### xiii. **Leonard Pearsall**.

192. Leonard Pearsall has resided at 1138 Paul Ed Dail Road for forty years.

193. Dust from Defendants' hog farms blows and trespasses onto his property, covering his house and truck with hog manure dust and other particulate matter.

194. The dust and particulate matter carry the hog odor.

195. The trespassing manure dust also attracts flies to his property.

196. The odor and the flies are terrible and getting worse all the time.

197. He also gets manure mist, from Defendants' land application, trespassing onto his property, covering his house and truck.

198. He and his family cannot be outside too much - the flies and the smell will take over.

199. Early in the morning, the odor is just awful.

200. When the wind starts blowing in the direction of his property, he cannot take it.

201. He used to walk about a mile and exercise almost every day, but he cannot do it any longer because of the odor and the flies.

202. The Defendants' hog trucks and dead trucks leave pools of liquid on the road and at the stop sign. He has to drive through the puddles, which results in his truck becoming covered in hog manure liquid.

203. When it rains the pools wash to the side of the road, trespassing onto his property and into his driveway.

204. He cannot leave the door open because of the smell and the flies.

205. The flies are everywhere – they are all over his screen door.

xiv.    **Norwood Earl Pearsall**.

206. Norwood Earl Pearsall lives at 1154 Paul Ed Dail Road. He has owned the property for sixty-six years.

207. He cannot cook outside anymore because he never knows what way the wind will be blowing.

208. He cannot hang his clothes outside anymore on the line because they will have a bad hog odor – the dust trespasses onto his property from the Defendants' hog farms, gets onto his clothes and makes them smell like hog manure.

### xv.     William Pearsall.

209. William Pearsall has resided at 1148 Paul Ed Dail Road for 55 years.

210. The hog lagoon is a half a mile from his house.

211. When Defendants sprayed the hog manure, the wind blows and the hog manure mist travels through the air and trespasses onto his land.

212. He likes to grill out, but he cannot do it anymore because of the flies that are attracted to the odor carried by the trespassing dust onto his property from Defendants' hog farms.

213. "When it gets hot, you cannot even go outside because the flies "will take you away."

### xvi.     Herndon Williams.

214. Herndon Williams has resided at the property at 248 E. T. Dobson Lane for his entire life of seventy-seven years.

215. He and his wife used to host cook outs all the time and now they don't because of the hog odor that is carried onto their property by the trespassing dust and mist from the land application field, which is just across the road from their house.

216. The trespassing dust and mist blows onto their property, covering their car and their house.

217. The odor from the trespassing dust and mist attracts flies and other bugs to their property.

218. The summertime is so bad. They must turn off the air conditioning because the hog odor carried by the hog manure dust will get sucked into the house by the air conditioner and then it takes days to get it out.

219. They go about 100 miles from home at least two - three times a week to actually get away and get some fresh air.

220. They used to be able to look out front and just see the woods. Now they are looking at the hog farm. They took all the trees down and the hog odor carried by the trespassing dust and mist coming from Defendants' hog farms is just awful.

221. They always take their shoes off before coming inside as they do not know whether there is hog manure that has trespassed onto their property that will get onto their shoes.

222. He cannot even use the new grill he bought because they cannot cook out anymore due to the hog odor.

xvii.     **Margaret Williams**.

223. Margaret Williams has resided at the property at 248 E. T. Dobson Lane, which she and her husband own, for over twenty years.

224. She was born and raised in the area. She and her husband moved away for a while. When they came back, they noticed the awful hog odor coming from Defendants' hog farms.

225. The odor is carried by the land application hog-manure mist that blows onto her property from Defendants' land application fields.

226. During the nighttime, the hog odor carried by the trespassing dust and mist is horrible. It smells all night long. Not even sealing windows and doors helps. Once the dust trespasses and gets into their house, it takes days to get it and the odor out.

227.    Their property is right in front of the hog farm.  When Defendants spray hog manure, especially if there is a wind gust, the hog manure mist trespasses onto their property, lands on their front porch, and covers their house in hog manure.

228.    Flies are attracted to the odor carried by the trespassing dust and mist.

      **xviii.**        **Mavis Womble**.

229.    Mavis Womble has resided at the property at 238 E. T. Dobson Lane, which she owns, for twenty-four years.  She lives less than one-half mile from the hog facilities.

230.    A lot has changed since Mavis has lived at this property.  She cannot go outside because of the hog stench.  Dust comprised of hog manure, urine and dander drifts and trespasses into her yard from Defendants' hog farms.

231.    That dust causes her property to stink.

232.    She now has to drive to wash her car because the smell is so terrible.  Moreover, if the wind is blowing her car will just get dirty again from the fecal mist that blows into her property from Vestal.

233.    Flies frequent her property to feast on the trespassing airborne fecal mist.  The flies are so bad that she cannot sit on her back porch.  The flies will bite her legs.  This never happened before Defendants operated Vestal.

**B.    SMITHFIELD AND MURPHY-BROWN**

234.    Smithfield owns or operates more than 250 hog farms in North Carolina.  Smithfield was the world's largest pork producer before it was purchased by the Chinese conglomerate WH Group for nearly 7 billion dollars[4].

---

[4] https://www.uscc.gov/sites/default/files/Testimony_Slane2013.pdf

235.    Smithfield exports nearly a fourth of its pork to China every single year.  In 2016 alone, China received nearly 300,000 tons[5] of pork from the United States much of which came from Smithfield.  The Chinese have found that raising hogs in North Carolina is cheaper because of the less stringent environmental regulations.  Moreover, the Chinese have lost millions of hogs due to African swine fever, making it even more appealing to import hogs from the United States. The Chinese have determined that they can export the meat but leave the manure for North Carolina residents to deal with the environmental repercussions.

236.    Murphy-Brown is a subsidiary of Smithfield. Wendell Murphy started Murphy-Brown in 1964.  Wendell Murphy was elected to the State House of Representatives and the North Carolina Senate.  He worked to protect the rights of "Big Hog."  He helped pass laws to help protect the hog industry. One of the laws is still referred to as "Murphy's Law." These laws nearly eliminated the environmental and zoning regulations on large-scale animal farms.

237.    The lack of environmental and zoning regulations has led to rampant problems throughout North Carolina. In Duplin county and other Counties, more than seven million gallons of hog manure[6] escaped from lagoons built to house the manure into nearby tributaries such as the South River and the Northeast Cape Fear River.

238.    Smithfield was fined 12.6 million dollars[7] for polluting the Pagan River-this was the largest imposed fine ever Under the Clean Water Act at the time.  Moreover, a single CAFO in North Carolina has polluted the Cape Fear River nearly 40 times.

---

[5] https://www.rollingstone.com/politics/politics-news/why-is-china-treating-north-carolina-like-the-developing-world-122892/
[6] https://www.npr.org/2018/09/22/650698240/hurricane-s-aftermath-floods-hog-lagoons-in-north-carolina
[7] https://www.justice.gov/archive/opa/pr/1997/August97/331enr.htm

239.    Duplin County, North Carolina is America's top hog-producing county.  Hogs out number humans nearly 30 to 1.  Nearly, 2 million hogs are found in Duplin County—more than 2,450 hogs per mile.  Each one of these hogs excrete nearly 14 pounds of manure each day.  This equates to about 15,700 tons of manure a day—enough to fill 40 Olympic size swimming pools daily.  According to Food and Water Watch, that is nearly twice as much poop as the human population of New York City, which is treated before discharge.

240.    The negative effects from these operations, including the stench and airborne manure from both stagnant and sprayed urine and feces, are experienced miles away and adversely impact the quality of life for impacted residents.

241.    North Carolina has more than 2,000 Industrial Hog Operations ("IHO"), housing nearly 9 million hogs.  The animals are crammed into large containment buildings.

242.    In order to maximize the amount and speed of weight gain, the animals live their entire lives inside the buildings, standing on slotted floors through which their urine, feces and other contaminants fall to collect in a storage pit underneath the building. Some of this evaporated manure is eventually blown into the air by large ventilation fans.

243.    The hogs typically produce between 4,500 to 15,000 gallons of hog feces and urine per building each day.

244.    The environmental consequences are recognized by the North Carolina Senate. The Legislature[8] in 1997 issued a moratorium on any new hog farms with 250 or more hogs to stop the damaging environmental effects of spraying hog manure as fertilizer.

---

[8] https://www.ncleg.net/EnactedLegislation/SessionLaws/HTML/1997-1998/SL1997-458.html

245. However, to get around the new law, Smithfield purchases existing hog farms that are grandfathered in and permissibly still use the "lagoon-and-spray" method to dispose of hog manure.

### C.    LAGOONS, SPRAYFIELDS, AND SWINE FACILITIES

246. There are five primary causes of odor in CAFOs: the production facility, manure treatment and storage facilities, mortalities stored on site, land application, and liquid draining from the Defendants' trucks transporting either live or dead hogs.  In multiple phases, urine and manure is injected into the air creating a "fecal mist" that travels to nearby residents.

247. Significant levels of airborne dust including particles from feed, manure, dander, and other particles are created in swine houses. Dust is a transportation vehicle for manure particles and other gaseous odorants.  The dust absorbs gaseous odorants and manure that is transported to nearby residents.  This fecal matter attracts buzzards, flies and gnats that can carry disease.

248. Within the swine houses live thousands of hogs. The hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floors into holding ponds below the floors that hold those raw feces and urine.  Stench rises from below the floors and throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure is blown out by large fans set in hog shed walls or by other means.  When the dust, skin cells, dander, particulates, dried fecal matter catch the wind they travel to nearby residents' homes. Many of the plaintiffs in this case must wipe windows, cars, and other household possessions because of the airborne fecal matter.

249. Fecal dust can travel for miles in the air according to scientific studies. Further, fecal matter can carry more than 150 harmful pathogens to humans.  Swine houses remove fecal

matter from their operations via ventilation fans because they can be harmful to the swine and especially to human workers. However, by blowing the fecal matter out of the hog facility, it causes nearby residents to be burdened by the showering of fecal mist.

250. The hog factories have a multitude of different ways to treat the harmful debris before discharge into the air. Some of the hog factories have large fans at the end of the narrow facilities that suck the debris from the facility into the air. Winds catch the debris and deposits the materials onto Plaintiffs' properties.

251. One of the other main causes of debris and fecal matter being deposited on Plaintiffs' properties are the holding facilities for manure, better known as lagoons. Lagoons are developed to house the millions of gallons of hog feces. The liquid manure at farms like Vestal are stored in lagoons. CAFOs discharge urine and feces from confinement buildings into the lagoons via pipes located above the lagoon surface. Urine and feces fall through the air and splashes into the lagoon, causing it to release odors and mist which is subsequently transported in the wind.

252. The manure and urine from the lagoons is spread on nearby fields. Often this is done by a "traveling gun" system in which liquid is sprayed up into the air, and mist can drift off. Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying. The use of subsurface injection or "knifing" the effluent into the ground can help lower odor. Yet on information and belief, Defendants have not required this at most of their swine sites in North Carolina even though they have replaced spray irrigation at sites in one or more other States.

253. Studies consistently show that lagoons emit toxic airborne chemicals that can result in major health problems. CAFOs consistently disregard neighbors by exposing them to pollutants in manures and their residuals.

254.     Plaintiffs, who are all located near lagoons and sprayfields are placed at substantial risk because of the hundreds of gases that are emitted by lagoons and the irrigation pivots.  One of those gases includes ammonia (a toxic form of nitrogen), which the US National institute of Occupational Safety and Health recognizes can irritate and burn the skin, mouth, throat, lungs and eyes.  Very high levels of ammonia can damage the lungs.  The pungent smell of ammonia in the air is detectable at concentrations as low as 5 ppm.  Large livestock operations like the ones at Vestal are the leading source of ammonia gas emissions in the United States[9].

255.     It is well known in the swine industry that land application of manure from the lagoons causes odor.  When anaerobic manure is applied, odors, bacteria, particulates and other debris is deposited into the air where it will drift.

256.     Plaintiffs have suffered episodes of noxious and sickening odor, onslaughts of flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts, gardening, lawn chores, the drifting of odorous mist and spray onto their land, inability to keep windows and doors open, and difficulty breathing and numerous other harms.

257.     North Carolina has recognized that lagoon and sprayfield systems are toxic.  Tom Bean[10], a consultant with the Environmental Defense Fund stated, "lagoon and sprayfield systems were not adequate." In 2007, the General Assembly passed a law, making new lagoons and spray systems illegal.  But the 2007 law left an exception. Farms that already had permits were exempt from these standards. Vestal is one of the grandfathered farms still using the outmoded lagoon and sprayfield system.

---

[9] https://www3.epa.gov/ttnchie1/ap42/ch09/related/nh3inventorydraft_jan2004.pdf
[10] https://www.northcarolinahealthnews.org/2015/05/22/bills-allow-idled-hog-farms-to-return-under-old-environmental-standards/

258.     The Defendants are a conglomerate of some of the richest companies in the world. WH Group alone had more than 22 billion dollars in revenue in 2019.  Smithfield's CEO has claimed that [11] "there is not a technology in North Carolina that performs better than a lagoon and spray field." However, there are many technologies that help dampen the odor in CAFOs.

259.     Lagoons are a low-cost treatment for hog manure on a per pig basis. They have lower installation cost, lower maintenance costs, than other more technological treatment types. While there is a moratorium imposed on lagoon and spray fields there is not a moratorium on CAFOs that utilize more environmentally friendly technology.

260.     Spray irrigation systems are also low-cost systems on a per pig basis.  The environmental costs are not assumed by the company, rather they are borne by the resident neighbors including the Plaintiffs in this case.

### D.     EVIDENCE OF NEGLIGENT, WILLFULL AND WANTON CONDUCT

261.     Murphy-Brown and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard to the harm known to be caused by the hogs. Over the years, Defendant Murphy-Brown has continued to cause its hogs to create conditions that trespass onto Plaintiffs' properties and cause injury without taking action to end the trespass despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

262.     The volume of manure and other produced at these confined places must be emitted from the containment facilities.  The CAFOs discharge this manure debris with ventilation fans

---

[11] https://www.fayobserver.com/news/20180616/suits-against-smithfield-could-leave-hog-industry-in-doubt

and land application procedures.  The particulates travel for miles redepositing onto nearby homes, land and water.

263.    Studies, reports, incidents and complaints that have amassed since Wendell Murphy first started the CAFO system clearly show predictable conditions wherein dust, skin cells, dander, particulates, dried fecal matter have trespassed on Plaintiffs' properties. However, Defendants have not stopped the trespass, even after Plaintiffs have complained.

264.    From the early 1990s to present, due chiefly to Defendant Murphy-Brown and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members and Plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendants' old system due to the indisputable evidence of harm and damage to neighbors. The spray and lagoon systems are toxic to the environment and cause constant trespass on Plaintiffs' properties. The fecal mist is rampant and is not properly controlled by the Defendants.

265.    Defendant Murphy-Brown and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water went into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

266.     Mr. Murphy in a news article dated February 19, 1995 stated that there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the groundwater." In fact, hog CAFOs do harm the groundwater. Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

267.     Mr. Murphy as reported on February 24, 1995 represented that CAFOs increased property values: "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave -- tell us about it. We'll buy it.'" Those statements were inaccurate. Numerous studies have shown that swine sites hurt property values. According to subsequent news reports, when one or more CAFO neighbors later sought to take Mr. Murphy up on his offer and to have him buy their properties, Mr. Murphy backed out and refused to do so.

268.     In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act. This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay. The company's failures resulted in more than 5,000 violations of permit limits over five years. These violations caused harm to the water quality of the Pagan River, the James River and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

269.     In April 1999, a spill at Vestal Farms, owned by Murphy Family Farms, dumped over a million gallons of water in Duplin County. Murphy Family Farms and the NC Pork Council claimed vandals caused the spill. The State found zero evidence to back up Murphy Family

Farms's claim. In fact there was vegetation growing near the lagoon, tree roots weakened the wall and there were erosion issues. Murphy Family Farms had been warned to clear the trees. The State concluded that excessive seepage through the dike wall was the probable cause. Nearly 2 million gallons spilled into a tributary of the Northeast Cape Fear River. Murphy Family Farms was fined $40,650.

270.    In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farm lagoons spilled and thousands of dead pigs floated in nearby areas. This hurricane and other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in our State. However, in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

271.    In 2003, the non-partisan RTI institute issued a report regarding the conditions that lagoon-and-sprayfield CAFOs have caused regarding Plaintiffs' properties. The report found among other things that the sites have a negative impact on "measures of human well-being" and found: "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms." It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation." Finally, it noted "disease-transmitting vectors." These vectors are directly caused by the manure and other elements that directly come from the hog farms.  These elements are deposited on Plaintiffs' properties from the lagoon and spray methods.

272.    Murphy-Brown has added special controls at sites in other States and has publicly admitted that it was to "reduce the level of odor produced by the farms." Defendants have added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due

to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." These lagoon covers prevent debris from trespassing on Plaintiffs' property.

273.    Epidemiological research reveals North Carolina residents living near industrial hog operations suffer disproportionately from acute blood pressure, wheezing, asthma, headaches, muscle aches, burning eyes, stress, anxiety, anemia and interrupted sleep.

274.    A 2005 study of residents within 1.5 miles of hog CAFOs in North Carolina's Duplin and Sampson counties found increased respiratory, sinus, and nausea problems, as well as higher levels of psychological distress.

275.    Researchers have established a link between higher rates of asthma symptoms in children and who attend schools near industrial hog operations.

276.    A 2006 survey of North Carolina schoolchildren correlated rates of wheezing to the children's proximity to hog CAFOs. Children attending schools within 3 miles of those operations were at the highest risk.

277.    Research also indicates neighbors of Defendants hog facilities are more likely to be exposed to antibiotic resistant bacteria.

278.    Antibiotic-resistant genes traced to the hogs have been found in the groundwater that makes its way into the community's wells.

279.    Scientists have also established such drug-resistant bacteria from these confined hogs, including Methicillin-resistant Staphylococcus aureus (MRSA), can be transmitted to humans.

280.     This is significantly more likely with industrial facilities because so many animals are crammed into close quarters and often fed sub-therapeutic levels of antibiotics to aid their growth and fight off the diseases to which they are exposed.

281.     In September 2018, the North Carolina Medical Journal published research further documenting the increased risk of serious health conditions suffered by residents living within three miles of hog CAFOs in North Carolina.

282.     The study compared communities with the highest concentration of hog operations to those without such operations (but similar in all other respects) and found there were 30% more deaths among patients with kidney disease, 50% more deaths among patients with anemia, and 130% more deaths among patients with a blood bacterial infection in communities near concentrated hog operations. These communities also experience greater risk of infant mortality and lower birth weights.

283.     This study also highlighted that North Carolina is unique among hog producing states because of its concentration of hog CAFOs in the southeastern part of the state; the average number of hogs per operation (much higher than in Iowa or Minnesota, the next 2 leading states for industrial swine production); and the population density in southeastern North Carolina, which exposes greater number of nearby residents and communities to the adverse health impacts of hog CAFOs.

284.     Because of the odors and health risks from the manure, residents near industrial animal agriculture facilities (both swine and chicken) are compelled to alter their lives and land uses.

285.     In contrast to Defendants' assertions that their hogs do not cause conditions that have trespassed onto Plaintiffs' properties or injury, numerous scientific reports and studies have

found that they do. These reports show that Defendants have actual knowledge of the conditions that have trespassed onto Plaintiffs' properties caused by its swine, or is willfully blind to that fact. They also support the fact that the Plaintiffs suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing and loss of enjoyment and have reasonable fears regarding the effect of the conditions that have trespassed onto Plaintiffs' properties upon them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

286.    Because one or more Defendant recklessly failed to perform proper studies to determine the potential harmful effects of the swine CAFOs before they had them built in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. The following are merely a few examples of the numerous studies that were produced from 1995 onward:

     i.    1995 study reviewed the effect of odors from large-scale hog operations on neighbors. The results indicated that persons living near the swine experienced odors and reported significantly more tension, depression, anger, fatigue, and confusion. Persons exposed to the odors also had more total mood disturbance.

    ii.   Studies from 1996 and later reflect that swine CAFOs are disproportionately located in communities of color and poverty and those communities were more susceptible to the conditions that have trespassed onto Plaintiffs' properties and were more likely to experience detrimental consequences.

   iii.   A 1997 study of neighbors living within a two-mile radius of a 4,000 sow swine facility found that they reported higher rates of negative effects.

iv.  A 1999 report found that health effects from swine sites included "odors" and "flies"among others.

v.  A 2000 study found that hog sites are concentrated in southeast North Carolina in poor, rural and African-American communities who are more susceptible to harm and who report decreased quality of life.

vi.  A 2000 study on odors from swine sites found that people living nearby reported more tension, depression, anger, fatigue, confusion, and less vigor.

vii.  In 2000, the North Carolina Council of Churches noted that hog operations adversely affect "those who live in the surrounding neighborhoods."

viii.  A 2002 paper described how CAFOs and their odor disrupt the quality of life for neighbors in rural communities.

ix.  A 2005 study reviewed the health effects of residents near industrial hog farms in the Duplin/Sampson County area and found increased psychological distress.

x.  2006 studies surveyed children from schools in North Carolina who were near CAFOs and suggested that swine odor adversely affects the children.

xi.  A 2006 study examined the air plume upwind and downwind from a CAFO and recommended buffering swine CAFOs from residential areas.

xii.  A 2007 report found that "The encroachment of a large-scale livestock facility near homes is significantly disruptive of rural living."

xiii.  A 2007 study found that due to factors like low income, inadequate housing, low health status, and insufficient access to medical care, racial discrepancies compound the negative impacts that hog farms create.

xiv.    A study from 2007 noted how "Odor gives a problem when pig farms are located close to residential areas."

xv.    A 2008 study investigated residents living within 1.5 miles of industrial swine operations in eastern North Carolina. The study indicated that odor is commonly present and that the odors are related to interruption of activities of daily life.

xvi.    A 2008 report found that "Recurrent strong odors" and "increased populations of flies are among the problems caused by CAFOs that make it intolerable for neighbors and their guests to participate in normal outdoor recreational activities or normal social activities in and around their homes."

xvii.    A 2008 study noted that for residents near CAFOs "hog odor limits several leisure time activities and social interactions." The study focused on nuisance in North Carolina, defined to include conduct that "is injurious to health, indecent, offensive to the senses, or an obstruction to the free use of property." The study found that within 1.5 miles of CAFOs, "hog odor limits activities of daily living that participants either 'enjoyed' doing the most or expected to be able to perform inside and outside their homes. It restricts, for instance, activities like cookouts, barbequing, family reunions, socializing with neighbors, gardening, working outside, playing, drying laundry outside, opening doors and windows for fresh air and to conserve energy, use of well water, and growing vegetables."

xviii.    A 2009 study found that individuals living in African-American communities in southeastern North Carolina near hog farms reported high rates of stress and negative mood.

xix.    A 2010 report noted how "CAFO odors can cause severe lifestyle changes for individuals in the surrounding communities and can alter many daily activities. When odors are severe, people may choose to keep their windows closed, even in high temperatures when there is no air conditioning. People also may choose to not let their children play outside and may even keep them home from school…. Odor can cause negative mood states, such as tension, depression, or anger…."

xx.    In 2011, a study summarized how "Animal manure and sewage sludge" were harmful to neighbors based on studies of 16 eastern North Carolina communities near industrial swine farms.

xxi.    A 2013 study found that "malodors may be associated with acute blood pressure increases that could contribute to development of chronic hypertension."

xxii.    A 2013 article noted "Swine finishing operations near residential areas can create public nuisance concerns due to the annoyance potential of odor emitted from the houses."

xxiii.    A 2014 study "odor concentrations … in the ventilation air from the pig rooms" and found the results "indicate an acute need for … odor mitigation technologies."

**E.    TARGETED INEQUALITY**

287.    [12]CAFOs are built near demographics that are traditionally discriminated against. African Americans in North Carolina are 1.54 times more likely than whites to live within three miles of a CAFO. Latinos are 1.39 times more likely than whites to live within that same distance from a CAFO.

---

[12] https://aldf.org/wp-content/uploads/2018/06/CAFOs-Plaguing-North-Carolina-Communities-of-Color.pdf

288.    There are over seven times more CAFOs in North Carolina communities with above-average percentages of low wealth and non-white residents than there are in wealthier, white communities.

289.    In response to a 2014 Title VI civil rights complaint filed by Plaintiffs NCEJN, REACH, and Waterkeeper Alliance against DEQ for the discriminatory effects of its swine General Permit and oversight of industrial swine operations, the EPA stated[13] it had "grave concerns" that North Carolina's permitting of CAFOs violates federal civil rights law.

290.    Recently, Judge Harvie Wilkson opined about the treatment of other neighboring landowners "If this were my property, I'd be outraged at some of these conditions that were allowed to persist. Less fortunate citizens have property rights, too.  They have a right to good health and enjoyment of their property.  If this were some McMansion surrounding hog farming operations, or houses of the affluent and more politically powerful were here, wouldn't these conditions have been cleared up sooner rather later?  That is my problem."

291.    Communities of color like this one have been targeted because they do not have the financial or political means to fight injustice.  The risks and burdens of living near CAFOs are disproportionately borne by North Carolina residents who, because of their race and ethnicity, have historically been and are still discriminated against, making the additional burdens these facilities impose even more harmful.

F.    TECHNOLOGY

292.    Defendants have the means to fix the trespass onto Plaintiffs' properties but choose not to because of cost.

---

[13] https://www.epa.gov/sites/production/files/2018-05/documents/letter_of_concern_to_william_g_ross_nc_deq_re_admin_complaint_11r-14-r4_.pdf

293.    Defendants employ the "lagoon and sprayfield" method of hog manure disposal. It is low-tech and cheap: hog urine and manure falls to the floor; passes through slats to a first holding pit. Then it is periodically drained to a second holding pit, this time a large open-air holding pond outdoors. Eventually it is land-applied to sprayfields, most often by a "gun" sprayer that causes much aerosol mist to drift. This system is inexpensive. It is also documented to pollute and contaminate and discharge manure gases, particles, germs and other substances by air and water.

294.    In 2000, the North Carolina Attorney General Mike Easley[14] reached a deal with Smithfield Foods to eliminate the use of open-air manure lagoon and sprayfield systems. He stated, "this agreement acknowledges that open-air hog lagoons are bad for North Carolina's environment, the health of its people and the quality of life in rural communities," said Daniel Whittle, attorney for the North Carolina Environmental Defense. "If fully implemented, this agreement should set in motion a process to get rid of hog lagoons in North Carolina once and for all." This agreement required Smithfield to fund and implement a program to determine alternative manure management technologies.

295.    One of the technologies that was developed was called "Super Soil." Essentially, the manure from the hogs gets treated in large takes and does away with the lagoons all together. The project was tested in North Carolina and according to the study "the year-long evaluation verified that the technology was technically and operationally feasible." However, this was not implemented in Defendants' facilities because Defendants did not want to spend the money.

---

[14] https://www.edf.org/news/environmentalists-applaud-action-requiring-smithfield-foods-eliminate-nc-hog-lagoons

296.     Countless studies have showed that engineered technologies for hog manure handling can be used to significantly reduce odors from swine confinement buildings. Belt systems can separate the manure from the urine to produce fuel grade ethanol.

297.     Electrostatic Particle Ionization uses technology to remove particles from the air. Murphy Brown's own studies showed that it removed 50% of the dust particles from confinement building air.  However, Defendants do not want to spend the money to retrofit their facilities.

298.     Dr. Shane Rogers tested air samples and physical samples from the exteriors and yards of 17 homes up to a mile away from a Smithfield hog CAFO and found bacteria only to be found in hog feces.  Of the 17 homes he tested, 14 tested positive for this specific strain of bacteria. Defendants have access to some of the most accomplished scientists in the entire world but choose not to test adjacent property owners because they know they will find evidence of trespass.

299.     Smithfield's CEO has claimed that "there is not a technology in North Carolina that performs better than a lagoon and spray field." He has stated that in open court and in front of legislatures.

300.     Only after several multi-million-dollar verdicts did Defendants decide that there is better technology available.  Defendants have announced that they would cover hog cesspools and add anaerobic manure digesters.

301.     This doesn't change the fact that for decades upon decades, Defendants have stated that there is no technology that is better than lagoon and spray field in hog manure removal management.

## V.     COUNT I- TRESPASS

302.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

303.     Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

304.     Defendants, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties. These hogs caused airborne dust, urine, particles from feed, manure, dander, and other manure contaminants to enter on Plaintiffs' properties.

305.     Defendants with no regard to Plaintiffs' properties used outmoded lagoon and sprayfields and swine house ventilation fans, which injected airborne dust, urine, particles from feed, manure, dander, and other manure contaminants to enter on Plaintiffs' properties.

306.     Defendants intentionally allowed and caused airborne dust, urine, particles from feed, manure, dander, and other manure contaminants to enter upon Plaintiffs' properties and to remain present upon Plaintiffs' properties.

307.     Defendants' entry and continued presence of injecting airborne dust, urine, particles from feed, manure, dander, and other manure contaminants to enter upon Plaintiffs' properties, was without the implied or express consent of the Plaintiffs and was therefore unauthorized.

308.     Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors from the airborne dust, urine, particle from feed, manure, dander, and other manure contaminants.  Flies, buzzards, and other insects scavenge on the vile manure contaminants which impairs Plaintiffs' enjoyment and use of their properties.

309.     Defendants' entry and continued presence of injecting airborne dust, urine, particles from feed, manure, dander and other manure contaminants which has caused flies, buzzards and other vectors of disease to scavenge on Plaintiffs' properties.  These scavengers are vectors for disease. This has substantially impaired Plaintiffs and their use and enjoyment of their properties,

and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, injury to and diminished value of properties, physical and mental discomfort and reasonable fear of disease and adverse health effects.

310.    Defendants have engaged in improper or negligent operation of the facilities during some or all of the pertinent times, causing harm to the Plaintiffs. Defendants' conduct has been unreasonable. Reasonable persons, generally, looking at Defendants' conduct, the problems caused by it, the character of the neighborhood, the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendants' conduct to be unreasonable.

311.    The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

312.    Defendants had actual knowledge during some or all of the pertinent times that the conditions created by the subject hogs were trespassing upon Plaintiffs' properties.

313.    Defendants knew or should have known that injecting hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine into the air from their hog facilities would recurrently trespass upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties, as well as injuring Plaintiffs.

314.    While knowing that practicable technologies and methods are readily available to abate the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine created by the subject hogs, Defendants have failed to abate the these conditions trespassing upon Plaintiffs' properties.

315.     During the pertinent times, the level of control that Defendants exercised over relevant aspects of the hogs and the facility operations rose to such a level that Defendants stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which resulted in the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine trespassing upon Plaintiffs' properties.

316.     Alternatively, during the pertinent times, Defendants' own direct involvement in material aspects of the operation of the facility management of the hogs renders Defendants independently liable for the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine trespassing upon Plaintiffs' properties.

317.     Alternatively, during the pertinent times, Defendants employed contract growers to do work which Defendants knew or had reason to know to be likely to involve the creation of the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine that would trespass upon Plaintiffs' properties, and is therefore subject to liability for harm resulting to Plaintiffs.

318.     Defendants' conduct described above constitutes a series of recurring abatable trespasses upon Plaintiffs' properties, which Defendants have failed to remedy within a reasonable period of time, and for which Defendants are liable.

319.     As a result of Defendants' liability for recurring abatable trespasses, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

320.     Defendants are jointly and severally liability for the harm caused to Plaintiffs.

321.     In accordance with Fed. R. Civ. P. 9(g), Plaintiffs hereby plead special damages including the diminished value and lost rental value of their homesteads and properties. Plaintiffs

show that, as homeowners and occupants of their family properties, one impact of Defendants' trespass upon Plaintiffs' properties has been the reduction of their property values. Numerous studies and reports have determined that hog CAFOs lower nearby property values. Plaintiffs allege that each of their homes and properties has lost significant value as a result of the proximity of Defendants' hogs and the objectionable conditions which Defendants have allowed to trespass upon Plaintiffs' properties, to be shown at trial. These damages are in addition to all other allowable damages, which the jury may award.

## VI.     COUNT II- NEGLIGENCE

322.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

323.     Defendants were negligent in allowing hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine to discharge, escape, or to be released from Vestal, and to travel to the properties owned or occupied by Plaintiffs. Specifically, Defendants:

     i.     Failed to take reasonable and adequate precautions in operating their Facilities to avoid airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine to travel onto Plaintiffs' properties.

     ii.     Failed to timely and adequately test for the presence of airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine within and outside their Facilities' premises and on adjacent properties, including the Plaintiffs' properties;

iii.   Failed to warn the Plaintiffs of the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine that would blow onto Plaintiffs' properties despite having constructive knowledge;

iv.   Were negligent in other ways which may be shown through discovery.

324.   At all pertinent times, Defendants had a duty of reasonable care as to the ownership, maintenance, and control of the hogs that it recurrently sent in groups to the Vestal swine facilities.

325.   During the pertinent times, the level of control that Defendants exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendants stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facilities in a negligent manner which caused injury to the Plaintiffs.

326.   Alternatively, during the pertinent times, Defendants' own direct involvement in material aspects of the operation of facilities and the management of the hogs renders Defendants independently liable for its breaches of its duty of due care with regard to the Plaintiffs.

327.   Defendants have recurrently breached their duty of due care. As a direct and proximate result of Defendants' breach of its duty of care, the Plaintiffs have been injured.

328.   During the pertinent times, Defendants knew or should have known that its actions and omissions were causing and contributing to cause harm to the Plaintiffs.

329.   The negligence of the Defendants was the proximate cause of the injuries and damages to the Plaintiffs and the Plaintiffs' properties as alleged herein and such injuries and damages were foreseeable.

330.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate Plaintiffs for the negligence of Defendants.

## VII.  CIVIL CONSPIRACY

331.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

332.    Defendants, have engaged in agreements to participate in an unlawful act or a lawful act in an unlawful means. The Defendants have engaged in agreements to participate in the intentional creation, of an intentional trespass.  The Defendants participated and/or continue to participate in an agreement with each other to mislead the public with respect to the science of hog manure removal ---so that they could continue contributing to, maintaining and/or creating the trespass without demands from the public that they change their behavior as a condition of further buying their products.  At all times the Defendants were worried that the public would become concerned by their behavior including the airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine blowing onto nearby properties. And that the growing concern would force a change in the Defendants' behavior which would be costly. Delaying these costs was the major objective the conspiracies described herein.

333.    The Defendants have committed overt acts in furtherance of their agreements.  The Defendants have participated in an agreement with each other to mislead the public and plaintiffs with respects to the technology of hog manure either individually or through various industry fronts, and have included overt acts that furthered their intentional creation, contribution to and/or maintenance of trespass on Plaintiffs' properties.

334.    The Defendants' overt acts contributed to and caused Plaintiffs' injuries.

335.    The Defendants' overt acts were a direct and proximate cause of Plaintiffs' injuries.

336.    The Defendants understood the general objectives of the scheme, accepted them, and agreed, explicitly and/or implicitly, to do their part to further the objectives of the scheme.

337. The Defendants are jointly and severally liable under federal common law to Plaintiffs for their injuries caused by the Trespass.

338. In the alternative, if federal common law were not to apply, the Defendants are jointly and severally liable under the common law of civil conspiracy under North Carolina law for their injuries caused by airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine.

339. The U.S. CONST. amend. XIV, § 1 states in part, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law. . ."

340. Under article 1, section 1 of North Carolina's constitution all persons are "endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness."

341. Under article 1, section 19 of North Carolina's constitution:

> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

342. Defendants have conspired to deprive Plaintiffs of their property, the enjoyment of the fruits of their own labor, and the pursuit of happiness without due process of law, contrary to the U.S. and the North Carolina constitutions.

## VIII. <u>DECEPTIVE TRADE PRACTICES ACT- N.C. GEN. STAT 75-1.1</u>

343. Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

344.    Defendants were engaged in "commerce" as that term is defined under the North Carolina Unfair and Deceptive Trade Practices Act. Defendants engaged in misleading, deceptive, and unfair trade practices, all in violation of the North Carolina Unfair and Deceptive Trade Practices Act.

345.    Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act in the following respects:

    i.    Mislead the public and plaintiffs with respects to the technology of hog manure maintenance and removal which lead to the contribution to and/or maintenance of trespass on plaintiffs' properties, which are tantamount to an unfair or deceptive act or practices, affecting commerce and proximately caused the Plaintiffs' damages and unmitigated damages to be proven at the trial in the matter;

    ii.    in other ways to be proven through discovery and at trial.

346.    As a result of the foregoing, Defendants are joint and severally liable to the Plaintiffs for all damages, actually and proximately caused by their actions and omissions.

347.    Based upon Defendants' violation of the North Carolina Unfair and Deceptive Trade Practice Act, Plaintiffs are entitled to recover damages.

348.    Upon a finding of a violation of North Carolina's Unfair and Deceptive Trade Practices Act, trebling of damages is automatic and is not in the direction of the court.

## IX.    UNJUST ENRICHMENT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

349.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

350.    Defendants failed to incur expenditures to limit or prevent the release of manure and other contaminants into the environment and prevent the contamination of Plaintiffs'

properties for a minimum of the time Vestal has operated, failed to incur the costs to timely investigate the impacts on Plaintiffs and their properties, failed to incur the costs to timely mitigate the impacts on Plaintiffs and their properties, and failed to incur costs to remediate the contaminated soil, dust and groundwater at Plaintiffs' properties. Defendants have been unjustly enriched by these and other failures to make expenditures to prevent the persons and properties of Plaintiffs from being contaminated.

351.    Defendants have received a measurable monetary benefit by failing to make the necessary expenditures. It would be unconscionable and contrary to equity for Defendants to retain that benefit. Defendants are therefore liable to Plaintiffs.

## X.    <u>PUNITIVE DAMAGES</u>

352.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

353.    Defendants' above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

354.    Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendants are properly liable for punitive damages in this action in that Defendants are liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

355.    The recurring conduct, acts, omissions, negligence, and impropriety of the Defendants were willful, wanton, malicious, and in reckless disregard for the rights and interests

of the Plaintiffs and justify an award of punitive damages. Accordingly, Plaintiffs demand judgment against Defendants for punitive damages in an amount to be determined at trial.

## XI.    INJUNCTIVE AND EQUITABLE RELIEF

356.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

357.    In addition to their claims for monetary damages, the Plaintiffs respectfully request entry of injunctive and equitable relief requiring the Defendants to implement and continue measures to alleviate and abate the conditions alleged herein.

## JURY TRIAL DEMAND

358.    Plaintiffs respectfully request a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this court:

a. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

b. Award the Plaintiffs punitive damages;

c. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses or fees, including attorneys' fees, to which they may be entitled by law;

d. Award the Plaintiffs appropriate injunctive and equitable relief;

e. An order for an award of reasonable attorneys' fees and litigation expenses; and

f. Award the Plaintiffs such other and further relief as is just and proper.

Respectfully Submitted,

Dated: 05/21/2020

_s/Inez de Ondarza Simmons_

Inez de Ondarza Simmons
**DE ONDARZA SIMMONS PLLC**
4030 Wake Forest Road, Suite 319
Raleigh, North Carolina 27609
North Carolina State Bar No. 34303
Telephone: (919) 256-3736
Email: Inez@DeOndarzaSimmons.com
LR 83.1 Counsel

and

*s/Adam William Krause*

Adam William Krause (Mo. Bar 67462) (Special Appearance)
adam@krauseandkinsman.com
Krause and Kinsman, LLC
4717 Grand Ave., Suite 300
Kansas City, Missouri 64112

and

*s/Charles F. Speer*

Charles F. Speer (Mo. Bar 40713)  *(Special Appearance Anticipated)*
cspeer@speerlawfirm.com
Speer Law Firm, P.A.
104 W. 9th St. Suite 400
Kansas City, MO 64105

and

Richard Middleton (GA. Bar 504912) *(Special Appearance Anticipated)*
rhm@middletonfirm.com
Middleton, L.L.C
107 East Gordon Street
Savannah, Georgia 31401

and

Scott Harrison (GA. Bar 769818) *(Special Appearance Anticipated)*
scott@middletonfirm.com
Middleton, L.L.C
107 East Gordon Street
Savannah, Georgia 31401

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21 May 2020, I caused the foregoing Amended Complaint to be filed with the Clerk of the Court for the United States District Court for the Eastern District of North Carolina via the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.


*/s/ Adam William Krause*